UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>

MITRA ARUWAH,

        Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security[1],

        Defendant.

</td><td>

Case No.  16-cv-02315-DMR

**ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 21

</td></tr>
</table>

Pro se Plaintiff Mitra Aruwah ("Plaintiff") moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied her application for benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. The Commissioner cross-moves to affirm. For the reasons stated below, the court denies Plaintiff's motion and grants the Commissioner's cross-motion.

## I.  PROCEDURAL HISTORY

Plaintiff is currently 34 years old. On January 5, 2012, Plaintiff filed an application for supplemental Social Security Income (SSI) benefits, alleging disability beginning on January 2, 2009. Administrative Record ("A.R.") 162-72.[2] Her application was initially denied on June 5, 2012 and again on reconsideration on January 30, 2013. A.R. 109-13 (Initial Denial), 115-19

---

[1]  On Jan. 20, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant. In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

[2]The ALJ's decision states that Plaintiff filed her SSI application on December 29, 2011, however Plaintiff's Application for Supplemental Security Income, to which the ALJ's decision cites, is dated January 5, 2012. A.R. 162-72. For purposes of this order, the court will use the date on Plaintiff's Application.

1    (Reconsideration). On March 19, 2013, Plaintiff filed a request for a hearing before an

2    Administrative Law Judge (ALJ). A.R. 120. ALJ Mary P. Parnow held a hearing on August 13,

3    2013 during which Plaintiff appeared and testified, along with medical expert (ME) Anthony E.

4    Francis, M.D., and vocational expert (VE) Christopher C. Salvo. A.R. 36-70. Following the

5    hearing, the ALJ directed Plaintiff to participate in a consultative examination, which was

6    performed by Omar Bayne, M.D. on September 17, 2013. A.R. 437-45. The ALJ also

7    propounded vocational interrogatories to VE John J. Komar, M.D., who provided answers on

8    November 29, 2013. A.R. 303-07.

9       On January 23, 2014, the ALJ issued a decision finding Plaintiff not disabled. A.R. 16-30.

10    In relevant part, the ALJ determined that Plaintiff was 28 years old on the date she filed her

11    application, and therefore is considered a "younger person" within the meaning of the Social

12    Security regulations (*see* 20 C.F.R. § 414.963(c)). The ALJ found that Plaintiff has the following

13    severe impairments: degenerative disc disease with bilateral radiculitis, right L5-S1 radiculopathy,

14    grade 1 L5-S1 spondyloisthesis, bilateral carpal tunnel syndrome (right worse than left), and a

15    history of insomnia. The ALJ further found that Plaintiff has at least a high school education, is

16    able to communicate in English, and is unable to perform any past relevant work. A.R. 21-29.

17    The ALJ determined that Plaintiff retains the following residual functional capacity (RFC):

18    Plaintiff can perform light work as defined in 20 C.F.R. § 416.967(b) (lift and carry 10 pounds

19    frequently and 20 pounds occasionally; sit, stand, or walk for six hours each in an eight hour

20    workday), except that Plaintiff can sit, stand, or walk for 30 minutes at a time, for an aggregate of

21    six hours of sitting, four hours of standing, and four hours of walking in an eight-hour workday;

22    can occasionally perform repetitive bending, twisting, crouching, crawling, stooping, and climbing

23    up and down stairs, inclines, ramps, or ladders; can occasionally perform repetitive flexion,

24    extension, and rotation of her neck and lumbar spine; can occasionally perform reaching, gripping,

25    grasping, handling fingering, feeling, pushing, and pulling with both hands; can work in any work

26    environment except on unprotected heights; and can occasionally work around moving mechanical

27    parts, operate a motor vehicle, and work in environments with humidity, extremes of temperatures,

28    and vibration. A.R. 24. The ALJ also relied on the opinion of the VE, who testified that an

individual with such an RFC could perform other jobs existing in the economy, including a call out operator and a surveillance system monitor. A.R. 30. The ALJ concluded that Plaintiff is not disabled.

The Appeals Council denied Plaintiff's request for review on June 26, 2015. A.R. 11-15. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Plaintiff then filed suit in this court pursuant to 42 U.S.C. § 405(g). Compl. [Docket No. 1].

## II. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[3] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3. At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20

---

[3] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

United States District Court
Northern District of California

C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.      At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.      At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Plaintiff's Testimony

Plaintiff gave the following testimony at the hearing.  Plaintiff was born on January 10, 1983 and was 30 years old on the day of the hearing.  A.R. 44.  She completed high school and received a high school diploma.  A.R. 45.  Plaintiff lives with her husband and four children, ages 2 through 11.  A.R. 52, 56.  Her husband used to stay at home with Plaintiff, but recently went back to work as a security guard because it was financially too difficult for him to stay at home.  A.R. 53-54.  Plaintiff's father, step-mother, and mother-in-law regularly visit Plaintiff in her home.  A.R. 53.

Plaintiff testified that she has worked in a number of short term jobs.  A.R. 60.  For example, Plaintiff worked as a Farsi interpreter for a psychiatrist once a month for approximately 7-8 months.  A.R. 58-59.  She left her interpreter job because the psychiatrist no longer wanted to work with her.  According to Plaintiff, the psychiatrist was really worried about her emotionally, and suggested that she seek professional help.  A.R. 59.  Plaintiff also worked for Masonic Homes of California for 4-5 months for approximately 20 hours per week assisting the elderly with their medication, keeping them company, and taking food to them.  A.R. 60.  Plaintiff was paid approximately $8.70 per hour.  A.R. 61.  Plaintiff left her job with the Masonic Homes because

1  the job changed and became more physical, requiring at least 2-3 hours of walking per day, as well

2  as lifting items and cleaning the entire kitchen. A.R. 60.

3       Plaintiff last worked in December 2008 as the full-time head coordinator for the Oakland

4  International Airport. A.R. 45, 47. Plaintiff earned approximately $34,000 in that position in

5  2008. A.R. 47. As the head coordinator, Plaintiff managed all ground transportation and

6  supervised 25 people. A.R. 62. Plaintiff also performed office work including writing incident

7  and field reports and letters scheduling people for vacation and leave. A.R. 45-46, 62. When in

8  the office, Plaintiff sat for approximately 2-3 hours per day. A.R. 46. She stopped working

9  because the position became "really hectic" and stressful, and she was in a lot of pain. A.R. 48.

10       Plaintiff testified that in her airport job, when she performed office work on the computer,

11  she experienced pain that began in her wrists; after an hour, her whole hand became numb. A.R.

12  49. The pain in Plaintiff's right hand is worse than her left, and Plaintiff is right-handed. A.R. 50.

13  Plaintiff did not type very fast because of her arm and wrist pain. A.R. 62. Plaintiff also testified

14  that she experienced back pain from sitting too long and from walking almost the entire airport to

15  check on everyone. A.R. 48.

16       Plaintiff saw Dr. Khan for her back pain and Dr. Bhattacharyya for her arm and wrist pain

17  for a year and a couple of months. A.R. 40-50. Dr. Khan and Dr. Bhattacharyya work in the same

18  clinic. A.R. 50. According to Plaintiff, Dr. Khan stated that the next step for her back pain is

19  surgery. A.R. 49. Plaintiff was given at least 4 referrals for surgery, but none of those surgeons

20  would accept Medi-Cal. Plaintiff reported that Dr. Khan was looking into other doctors. A.R. 57.

21       In addition to the back and arm and wrist pain, Plaintiff testified that she also experiences

22  stress and depression that affect her ability to work. A.R. 51. Plaintiff took pain medication as

23  well as Sertraline for approximately one year, which was prescribed by Dr. Khan. A.R. 51-52.

24  Plaintiff was not taking any medication for her depression prior to taking Sertraline. A.R. 52.

25  Although not entirely clear, Plaintiff appears to take Sertraline for anxiety; Dr. Khan did not

26  prescribe a different medication for Plaintiff's anxiety because Plaintiff does not have good

27  insurance. A.R. 57.

28       On an average day, when Plaintiff's pain is not at its worst, but not at its best, Plaintiff

wakes up around 12:00 p.m. or 1:00 p.m. if she is taking her medication, and around 5:00 a.m. or 6:00 a.m. if she is not taking her medication. A.R. 53. Since Plaintiff's husband started working, Plaintiff's 11-year old daughter helps her out a lot. A.R. 54. When Plaintiff gets up at noon, she does not do much. A.R. 55. Plaintiff often stays at home and lies in her room or in the living room so that she can watch her children. A.R. 55. She does not read or watch television when she is lying down; she simply lies there. A.R. 55. Plaintiff tries not to rely on her medication too much, particularly her depression medication, because it "zones [her] out." A.R. 55.

Plaintiff testified that her social anxiety prevents her from going back to work. A.R. 56. She pushed herself physically while working at the Oakland International Airport, despite the pain she felt. A.R. 56. However, when she interacted with people at work, including her supervisors, she was anxious and nervous. A.R. 57.

### B. Relevant Medical Evidence

#### 1. 2010 - 2012 Medical Records

Plaintiff's medical records show that from January 2010 through July 2012, she received treatment for her wrist pain, back pain, neck pain, and thyroid condition from various providers, including treating physicians Dr. Ahmadi and Dr. Bhandari.

Regarding her wrist pain, in January 2010, Plaintiff complained of wrist pain in both hands attributable to carpal tunnel syndrome, and was prescribed a splint and medications as needed. A.R. 313. In February 2012, at the request of Dr. Bhandari, Dr. Bhattacharyya conducted an EMG, Nerve Conduction Velocity and F-Wave Latency Study on Plaintiff's hands. A.R. 419. The results of the EMG study were abnormal and suggestive of severe bilateral carpal tunnel syndrome, with the right worse than the left. A.R. 419. However, the EMG study showed no evidence of cervical radiculopathy.[4] A.R. 419.

Regarding her back and neck pain, in November 2010 and June 2011, Plaintiff complained of back, neck and shoulder pain for which Plaintiff appears to have been prescribed pain

---

[4] Radiculopathy is defined as "a disorder of the spinal nerve roots." STEDMAN'S MEDICAL DICTIONARY, at 1622 (28th ed. 2006).

medications.  A.R. 314-15.  A November 2010 lumbar spine x-ray ordered by Dr. Ahmadi revealed L5-S1 grade 1 spondylolisthesis[5] and bilateral spondyloysis.[6]  A.R. 316.  In January 2012, Plaintiff had cervical, thoracic, and lumbar spine x-rays performed.  A.R. 333-34.  According to the January 2012 lumbar spine x-ray, her L5-S1 grade 1 spondylolisthesis and bilateral spondyloysis remained unchanged; her cervical spine showed no radiographic evidence of discogenic disease, but there appeared to be a question regarding cervical spasms; and her thoracic spine was normal.  A.R. 333-34.  In April 2012, Plaintiff went to the emergency department complaining of back pain in her lower right side that radiated to the right lower back and right gluteus maximus and that increased with right leg movement.  A.R. 375.  Upon physical examination of Plaintiff's back, there was full range of motion and there was no evidence of spinal tenderness, costovertebral tenderness, or deformity or sign of trauma.  A.R. 378.  A lumbar spine x-ray revealed grade 1 anterolisthesis[7] at L5-S1 with possible spondylolysis and L5-S1 disc disease.  A.R. 386.  Plaintiff was prescribed pain medications and released.  A.R. 374.  Plaintiff returned to the emergency room the next day complaining of lower back pain radiating to the right thigh with tingling.  A.R. 364.  Plaintiff was diagnosed with lumbosacral muscle sprain, prescribed pain medication, and discharged the same day.  A.R. 365.  Upon discharge, Plaintiff's pain was 0 out of 10 on a pain scale.  A.R. 365.  In June 2012, Dr. Bhandari ordered lumbar spine x-rays which revealed grade 1 L5-S1 spondylolisthesis and bilateral spondylolisthesis with broad-based

---

[5] Spondylolisthesis is defined as an abnormal "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum."  STEDMAN'S MEDICAL DICTIONARY, at 1813 (28th ed. 2006).

[6] Spondylosis is defined as an "ankyloses [which is "[s]tiffening or fixation of a joint as a result of a disease process, with fibrous or bony union across the joint] of the vertebrae; often applied nonspecifically to any lesion of the spine of a degenerative nature."  STEDMAN'S MEDICAL DICTIONARY, at 95, 1813 (28th ed. 2006).

[7] Anterolisthesis "'is a spine condition in which the upper vertebral body, the drum-shaped area in front of each vertebrae, slips forward onto the vertebra below. The amount of slippage is graded on a scale from 1 to 4. Grade 1 is mild (less than 25% slippage), while grade 4 is severe (greater than 75% slippage).'"  *Bravo v. Berryhill*, No. CV 16-5741 SS, 2017 WL 2485222, at *3 (C.D. Cal. June 8, 2017) (quoting https://www.spine-health.com/glossary/anterolisthesis) (last accessed on August 24, 2017).  "Anterolisthesis 'is basically another term for spondylolisthesis.'"  *Id*.

central disc bulge and/or protrusion, and a mild degree of spinal canal stenosis;[8] and a L4-5 central disc protrusion that might abut the proximal L5 nerve roots.  A.R. 400.

Regarding her thyroid condition, in July 2012, Plaintiff went to the emergency department complaining about a lump and pain in her neck aggravated by swallowing.  A.R. 344-45.  The physical examination of Plaintiff's neck revealed mild pain over the anterior thyroid cartilage.  A.R. 349.  Plaintiff's blood tests including her thyroid function test were normal.  A.R. 350.  Plaintiff was discharged with medication.  A.R. 350.  A thyroid ultrasound later revealed a complex cystic right lower lobe thyroid nodule.  A.R. 399.  No further treatment for this condition appears in the record.

### 2. Treating Physician Bhupinder Bhandari, M.D.

Plaintiff saw treating physician Dr. Bhupinder Bhandari from January 2010 through July 2012 for carpal tunnel syndrome, back pain, neck pain, and thyroid issues.  A.R. 321-339 (Progress Notes from January 2010 through April 2012); A.R. 394-98 (Progress Notes from April 2012 through July 2012).  For these conditions, Dr. Bhandari ordered an EMG nerve conduction study, X-rays, and a thyroid ultrasound, the results of which are summarized above.  He prescribed pain medications.  A.R. 394-98.  There are no medical records showing treatment after July 2012.  More than six months later, on March 12, 2013, Dr. Bhandari wrote a letter stating that Plaintiff was "unable to work due to her medical condition."  A.R. 423.

### 3. Consulting Physician Omar Bayne, M.D.

Examining physician Dr. Omar Bayne performed a consultative examination on September 17, 2013, after the hearing before the ALJ.  A.R. 437-39 (narrative report); 440-45 (Medical Source Statement).  At the time of the examination, Plaintiff's chief complaints were neck pain, back pain, and bilateral hand and wrist pain and numbness.  A.R. 437.

Upon a general physical examination, Dr. Bayne observed that Plaintiff was a healthy-appearing 30 year-old right-handed person in no acute distress; ambulated with a mild antalgic

---

[8] Stenosis is defined as a "stricture of any canal or orifice." STEDMAN'S MEDICAL DICTIONARY, at 1832 (28th ed. 2006).

gait; was able to walk on her heels and toes with some difficulty; was able to sit and get up from a sitting to a standing position with loss of her normal spinal rhythm due to neck and low back pain; and was able to squat 50% of normal.  A.R. 437.

Upon physical examination of Plaintiff's cervical spine and upper extremities, Dr. Bayne observed the following: (1) Plaintiff lost a normal lordotic curve of her cervical spine and experienced muscle spasms in various areas in her cervical spine; (2) Plaintiff had full range of movement in her shoulders, elbows, wrists, and fingers; (3) Plaintiff's grip and pinch strengths was 5/5 on her left and 4/5 on her right; (4) Plaintiff had a positive Tinel's and Phalen's test related to her carpal tunnel syndrome with numbness and tingling in her thumb, index, and middle fingers, with the right hand worse than the left; (5) the Spurling test was negative for radiculopathy bilaterally; and (6) Plaintiff's sensation was normal in all dermatomes[9] in the upper extremities, and Plaintiff's manual motor muscle strength testing was 5/5 in all muscle groups in the upper extremities.  A.R. 437-38.

Upon physical examination of Plaintiff's thoracolumbrosacral spine and lower extremities, Dr. Bayne observed the following: (1) Plaintiff lost the normal lodortic curve of her lumbar spine, but had no kyphosis[10] or scoliosis[11]; (2) Plaintiff was moderately tender to palpitation over the lumbosacral junction and had significant right paralumbar muscle spasms and tightness to palpitation; (3) Plaintiff had full range of motion in her hips, knees and ankles, but experienced certain pain when a straight leg was raised 60 degrees and 90 degrees; (4) Plaintiff's manual motor muscle strength testing was 5/5 in all muscle groups in the lower extremities; (5) Plaintiff had normal sensation in all dermatomes in the lower extremities except decreased sensation to light touch over the right L5-S1 dermatome distribution; and (6) Plaintiff had a range of motion of her

---

[9] A dermatome is defined as the "area of the skin supplied by cutaneous branches of a single cranial or spinal nerve." STEDMAN'S MEDICAL DICTIONARY, at 519 (28th ed. 2006).

[10] Kyphosis is defined as an "anteriorly concave curvature of the vertebral column." STEDMAN'S MEDICAL DICTIONARY, at 1036 (28th ed. 2006).

[11] Scoliosis is defined as the "[a]bnormal lateral and rotational curvature of the vertebral column." STEDMAN'S MEDICAL DICTIONARY, at 1734 (28th ed. 2006).

lumbar spine forward flexion 60 degrees, extension 10 degrees, lateral bending and rotation 10 degrees with low back spasms.  A.R. 438.

Dr. Bayne diagnosed Plaintiff with the following conditions: (1) chronic neck strain/sprain; (2) cervical degenerative disc disease with bilateral radiculitis; (3) chronic lower back strain/sprain with right L5-S1 radiculopathy; (4) Grade 1 L5-S1 spondyloisthesis; (5) bilateral carpal tunnel syndrome, right worse than left; (6) history of insomnia; (7) history of reactive depression; and (8) history of anxiety.  A.R. 438.

Based on his physical examination, Dr. Bayne opined that Plaintiff had no gross, visual or speech impairment; should be able to converse, communicate, understand, read and write in English; should be able to drive or take public transportation; should be able to stand and walk with appropriate breaks for six hours during an eight-hour workday; should be able to sit with appropriate breaks for six hours during an eight-hour workday; is limited to occasionally performing repetitive bending, twisting, crouching, crawling, stooping, climbing up and down stairs, inclines, ramps or ladders; is limited to occasionally performing repetitive flexion, extension, and rotation of the lumbar spine; should be able to lift and carry 10 pounds frequently and 20 pounds occasionally; is limited to occasionally performing bilateral repetitive finger, hand, and wrist manipulation or bilateral repetitive hand tasks; is limited to occasionally performing gripping, grasping, pushing and pulling with both hands; and should be able to work in any work environment except on unprotected heights.  A.R. 438.

In his Medical Source Statement, Dr. Bayne's assessments regarding Plaintiff's restrictions were the same as those in narrative report except for the following: Plaintiff could sit, stand, and work for 30 minutes at a time, for a total of six hours sitting, four hours standing, and four hours walking in an eight-hour workday; Plaintiff was limited to occasionally performing reaching, handling, fingering, and feeling bilaterally; and Plaintiff could occasionally work around moving mechanical parts, operate a motor vehicle, and work in environments with humidity, temperature extremes, and vibration.  A.R. 441-42, 444.

### 4.      State Agency Medical Consultants

L. Pancho, M.D., a state agency medical consultant, completed a disability determination

of Plaintiff on May 25, 2012 including a physical residual functional capability assessment. As part of the physical residual functional capability assessment, Dr. Pancho found that Plaintiff had certain exertional limitations which included occasionally[12] lifting and/or carrying 20 pounds; frequently[13] lifting and/or carrying 10 pounds; standing and/or walking (with normal breaks) for about 6 hours in an 8 hour workday; and sitting (with normal breaks) for about 6 hours in an 8 hour workday. A.R. 88. Dr. Pancho also found that Plaintiff had postural limitations which included stooping (i.e., bending at the waist) and crouching (i.e., bending at the knees) occasionally. A.R. 88. Dr. Pancho further found that Plaintiff had manipulative limitations which included limited handling (gross manipulation) in both hands and limited fingering (fine manipulation) in both hands. A.R. 88. Dr. Pancho noted that because Plaintiff's right hand was worse than her left hand, handling and fingering was limited to occasionally for her right hand and frequently on the left hand. A.R. 89.

Robert Mitgang, M.D., another state agency medical consultant, completed a disability determination of Plaintiff at the reconsideration level on January 3, 2013 including a physical residual functional capacity assessment. A.R. 103. Dr. Mitgang's findings were the same as Dr. Pancho's. A.R. 102-03.

### 5. Medical Expert Anthony E. Francis, M.D.

At the hearing, Dr. Francis, an orthopedic surgeon, testified that he reviewed Plaintiff's medical records and that the relevant medical diagnosis was grade one spondylolisthesis, which is forward slipping in the lumbar spine 25 percent or less of the L5 vertebrae on the S1 vertebrae. A.R. 41-42. Dr. Francis testified that he could not opine that Plaintiff could not work based on her grade one spondylolisthesis and her chronic pain because there was not sufficient information from which to draw conclusions about Plaintiff's functional limitations. A.R. 43.

### C. Vocational Expert Christopher C. Salvo

At the hearing, Mr. Salvo testified that Plaintiff's job at the Oakland International Airport

---

[12] Occasionally is defined as "cumulatively 1/3 or less of an 8 hour day." A.R. 88.

[13] Frequently is defined as "cumulatively more than ½ up to 2/3 of an 8 hour day." A.R. 88.

was a combination of a superintendent of transportation position, DOT code 184.167-226, and an office manager position, DOT code 169.167-034. A.R. 63. The superintendent of transportation position is a skilled position with an SVP[14] of 8 and is light in nature. A.R. 63. The officer manager is a skilled occupation with an SVP of 7 and is sedentary in nature. A.R. 63. Mr. Salvo testified that he was not sure how Plaintiff was placed in the position of head coordinator at Oakland International Airport given her limited work history and education. A.R. 63.

Mr. Salvo also testified that an individual with the following restrictions could perform work as a barker, DOT code 342.657-010, which is an unskilled position with an SVP of 2 and is light in nature: the individual is 30 years old, has a high school education, has Plaintiff's past relevant work history, is capable of a modified range of light work, can occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk six hours in an eight hour day, sit for six hours in an eight-hour day, can occasionally stoop, occasionally crouch; has manipulative limitations such that handling and fingering is limited to occasionally on the right and frequently on the left; is right-hand dominant; would be best working with simple one or two-step instructions; can maintain adequate attention, concentration, persistence, and pace to perform routine tasks; and is able to adjust to changes and be aware of the usual hazards in a regular work environment and travel by public transportation. A.R. 65. Mr. Salvo further testified that an individual with all of the above restrictions except that instead of one or two-step instructions, the individual would be best working with simple, repetitive tasks, could perform work as a cashier, DOT code 211.465-010, which is unskilled light work, and storage rental facility clerk, DOT code 295.367-026, which is an unskilled position with an SVP of 2 and is light in nature. A.R. 68.

---

[14] "'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230, n.4 (9th Cir. 2009) (quoting *Dictionary of Occupational Titles*, Appendix C, p.1009 (4th ed. 1991)). "'The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT.'" *Bray*, 554 F.3d at 1230, n.4 (quoting *Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000)).

## IV.   STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.   ISSUES PRESENTED

Liberally construing Plaintiff's opening brief, Plaintiff appears to contend that the ALJ erred by (1) failing to properly evaluate the medical evidence of her rheumatoid arthritis, back pain, carpal tunnel syndrome, and fibromyalgia, and (2) discounting her subjective complaints of pain. *See Davis v. Colvin*, No. 14-CV-03870-JSC, 2015 WL 5569101, at *8 (N.D. Cal. Sept. 22, 2015) ("Where, as here the plaintiff is proceeding pro se, the Court has 'an obligation . . . to construe the pleadings liberally and to afford the petitioner the benefit of any doubt.'") (quoting *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc)). The court considers each argument in turn.

## VI. DISCUSSION

### A. The ALJ Properly Evaluated the Relevant Medical Evidence

Plaintiff argues that she is entitled to summary judgment because she provided all her medical records that show that she has back pain,[15] carpal tunnel syndrome, rheumatoid arthritis, and fibromyalgia. Liberally construing Plaintiff's opening brief, Plaintiff appears to argue that the ALJ erred in failing to properly evaluate the medical evidence of her impairments in its non-disability determination, and in its assessment of her RFC.

At the outset, the court observes that only Plaintiff's back pain and carpal tunnel syndrome were before the ALJ and the Appeals Council and thus are properly part of the administrative record. *See Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1164 (9th Cir. 2012) (explaining that "as a practical matter, the final decision of the Commissioner includes the Appeals Council's denial of review, and the additional evidence considered by that body is evidence upon which the findings and decision complained of are based" (citation and internal quotations marks omitted)).

Plaintiff's alleged rheumatoid arthritis and fibromyalgia are new conditions that were not before the ALJ or the Appeals Council, and thus are not part of the administrative record that this court may review. *See Belton v. Berryhill,* No. ED CV 16-02165-JDE, 2017 WL 3438446, at *10 (C.D. Cal. Aug. 10, 2017) (finding that exhibits not submitted to Appeals Council when the plaintiff requested review of the ALJ's denial "[were] not part of the record that [the] . . . [c]ourt may review here" and that "those exhibits may only be reviewed by the Agency if [the] [c]ourt decides that remand is warranted"). Therefore, with respect to Plaintiff's alleged rheumatoid arthritis and fibromyalgia, this court may only decide whether remand to the ALJ is appropriate under 42 U.S.C. § 405(g) for consideration of these new conditions. *See Wainwright v. Sec'y of Health & Human Servs.*, 939 F.2d 680, 682 (9th Cir. 1991) ("Remand for consideration of new evidence is appropriate if a claimant presents evidence that is material to determining disability, and there is good cause for the failure to produce the evidence earlier.") (citing *Embrey v. Bowen*,

---

[15] Plaintiff states that she has "arthritis in her back." Mot. at 1. The court construes this phrase to refer generally to her back conditions and back pain.

14

United States District Court
Northern District of California

849 F.2d 418, 423 (9th Cir. 1988) and 42 U.S.C. § 405(g)). Under sentence six of 42 U.S.C. § 405(g), "[t]he [district] court may . . .at any time order additional evidence to be taken before the Commissioner, . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."

Accordingly, the court will analyze the ALJ's findings regarding Plaintiff's back conditions and back pain and carpal tunnel syndrome under the substantial evidence standard, discussed above. The court will then consider whether remand to the ALJ is appropriate under 42 U.S.C. § 405(g) for consideration of Plaintiff's new conditions, i.e., rheumatoid arthritis and fibromyalgia.

### 1. Legal Principles

"In determining the ultimate issue of disability, [Plaintiff] bears the burden of proving she is disabled." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). The mere fact that a plaintiff is diagnosed with an impairment is not, by itself, "proof of a disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability."); *Sample v. Schweiker*, 694 F.2d 639, 642–43 (9th Cir. 1982) (an impairment alone is not "per se disabling"; rather, "there must be proof of the impairment's disabling severity") (citation and internal quotation marks omitted).

In determining a claimant's RFC at step four of the sequential analysis, an ALJ must consider "all of the relevant medical and other evidence" in the record, 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), and must consider all of the claimant's "medically determinable impairments," including those that are not severe. 20 C.F.R. § 404.1545(a)(2); *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also* SSR 96–8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments [because] limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."). The court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole

supports the decision. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). In making an RFC determination, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints. *See id.* (upholding RFC determination where "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints.").

### 2. Analysis of Back Conditions and Carpal Tunnel Syndrome

#### a. Back Conditions

The ALJ made a number of findings related to Plaintiff's back conditions. Specifically, the ALJ found that Plaintiff's various back conditions were severe impairments. *See* A.R. 21 (listing degenerative disc disease with bilateral radiculitis, right L5-S1 radiculopathy, grade 1 L5-S1 spondylolisthesis, as severe impairments). However, the ALJ determined that Plaintiff's lumbar degenerative disc disease was not a disabling impairment because there was no evidence of (1) compression of a nerve root or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion for the spine, motor loss accompanied by sensory or reflex loss, and, positive straight-leg raising test if there is involvement of the lower back; (2) spinal arachnoiditis, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; and (3) lumbar spinal stenosis resulting pseudoclaudication, manifested by chronic nonradicular pain and weakness and resulting in an inability to ambulate effectively. A.R. 23. The ALJ also generally observed for all of Plaintiff's alleged disabling impairments that Plaintiff's treatment was routine and/or conservative in nature, (i.e., pain medications); there was no physical therapy or more invasive treatment such as steroid injections or any recommendations for surgery that might indicate greater severity;[16] and Plaintiff did not seek or receive treatment from a specialist. A.R. 28. These findings are borne out by the medical evidence in the record. *See*

---

[16] The court notes that during the hearing, Plaintiff testified that Dr. Khan gave her at least 4 referrals for back surgery, and was continuing to look for other doctors because none of these surgeons accepted Medi-Cal insurance. A.R. 49, 57. There is no evidence in the record of these referrals for back surgery, or progress notes or treatment records reflecting Dr. Khan's back surgery recommendation.

United States District Court
Northern District of California

*supra* at 6-9. Furthermore, as discussed in greater detail below, the ALJ did not find Plaintiff's allegations of disabling pain to be fully credible for a number of reasons, including the extensive nature of her daily activities, (i.e., taking care of four small children), her limited work history, the conservative treatment she received for her back pain, the inconsistency in her testimony about her past work, and the fact that no treating or evaluating physician found her disabled from work due to her back.[17] A.R. 27-28.

To the extent that Plaintiff contends that the ALJ did not properly account for her back conditions in determining her residual functional capacity, Plaintiff's argument is unpersuasive. The ALJ found, among other things, that Plaintiff could perform light work, i.e., lifting and carrying 10 pounds frequently and 20 pounds occasionally; that Plaintiff could sit for an aggregate of 6 hours per day, walking for an aggregate of hours per day, and stand for an aggregate of 4 hours per day; that Plaintiff could occasionally perform repetitive bending, twisting, crouching, crawling, stooping, and climbing up and down stairs, inclines, ramps, or ladders; and could occasionally perform repetitive flexion extension, and rotation of her neck and lumbar spine. A.R. 24. These findings are supported by substantial record evidence including Plaintiff's medical records, and the September 17, 2013 consultative exam performed by Dr. Bayne. A.R. 314-15 (November 2010 and June 2011 medical records), 316 (November 2010 lumbar spine x-ray) 333-34 (January 2012 lumbar spine x-ray), 364-65 (medical records from second April 2012 emergency room visit), 374-75 (medical records from first April 2012 emergency room visit), 378 (medical record from first April 2012 emergency room visit), 437-39 (Bayne narrative report); 440-45 (Bayne Medical Source Statement).

Since Plaintiff has not explained or demonstrated how the ALJ erred, and there is

---

[17] The ALJ properly rejected the March 12, 2013 opinion of treating physician Dr. Bhandari that Plaintiff was "unable to work due to her medical condition," A.R. 423, because it is conclusory, vague as to what "medical condition" it refers to, and does not appear to be supported by any clinical findings. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) ("'[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings.'") (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)) (emphasis in original omitted). Moreover, Dr. Bhandari made his conclusory opinion more than six months after Plaintiff's last visit with him.

substantial evidence to support the ALJ's findings, the court cannot conclude that the ALJ erred in finding that her back conditions were not disabling. Nor did the ALJ err by failing to properly account for Plaintiff's back conditions in determining her residual functional capacity. *See Johnson*, 60 F.3d at 1432. The mere fact that Plaintiff was diagnosed with several back conditions is not, by itself, "proof of a disability." *Matthews*, 10 F.3d at 680; *Sample*, 694 F.2d at 642–43.

### b. Carpal Tunnel Syndrome

Similarly, the ALJ made a number of findings regarding Plaintiff's carpal tunnel syndrome. The ALJ found that Plaintiff's carpal tunnel syndrome was a "severe impairment." *See* A.R. 21 (identifying bilateral carpal tunnel syndrome (right worse than left) as a severe impairments). However, the ALJ determined that Plaintiff's carpal tunnel syndrome was not a disabling impairment. A.R. 23. There is substantial evidence in the record to support these findings. *See supra* at 6. The ALJ found that Plaintiff's treatment of her carpal tunnel syndrome was conservative. The ALJ also found that Plaintiff's pain allegations were not fully credible. A.R. 27-28.

To the extent that Plaintiff contends that the ALJ did not properly account for her carpal tunnel syndrome in determining her residual functional capacity, Plaintiff's argument is again unpersuasive. The ALJ found, among other things, that Plaintiff could occasionally perform reaching, gripping, grasping, handling, fingering, feeling, pushing, and pulling with both hands. A.R. 24. These findings are supported by substantial record evidence including Plaintiff's medical records, and the September 17, 2013 consultative exam performed by Dr. Bayne. A.R. 313 (January 2010 medical record), 419 (February 2012 EMG Nerve Conduction Velocity and F-Wave Latency Study), 437-39 (Bayne narrative report); 440-45 (Bayne Medical Source Statement).

Since Plaintiff has not explained or demonstrated how the ALJ erred, and there is substantial evidence to support the ALJ's findings, the court cannot conclude that the ALJ erred in concluding that Plaintiff's carpal tunnel syndrome was not a disabling condition. Similarly, the court finds that the ALJ did not err by failing to properly account for carpal tunnel syndrome in determining Plaintiff's residual functional capacity. *See Johnson*, 60 F.3d at 1432; *Matthews*, 10

18

F.3d at 680; *Sample*, 694 F.2d at 642–43.

### 3. Analysis of New Conditions - Rheumatoid Arthritis and Fibromyalgia

#### a. Legal Principles

"For evidence submitted after the Appeals Council issues its decision, remand for consideration of new evidence is appropriate [under 42 U.S.C. § 405(g)] if a claimant presents evidence that is material to determining disability, and there is good cause for the failure to produce the evidence earlier[.]" *Atkinson v. Colvin*, No. 1:14-CV-01268-AC, 2015 WL 5330794, at *9 (D. Or. Sept. 9, 2015) (citing *Wainwright v. Sec'y of Health and Human Servs.*, 939 F.3d 680, 682 (9th Cir. 1991)); *see also Davis*, 2015 WL 5569101, at *9 (explaining that "a court may only remand a case to the Commissioner for further action by the Commissioner" in the face of evidence submitted to the district court in the first instance) (citing 42 U.S.C. § 405(g)).

"New evidence is material [under sentence six of 42 U.S.C. § 405(g)] when it 'bear[s] directly and substantially on the matter in dispute,' and if there is a 'reasonabl[e] possibility that the new evidence would have changed the outcome of the . . . determination.'" *Luna v. Astrue*, 623 F.3d 1032, 1034 (9th Cir. 2010) (quoting *Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir. 2001) (alterations and omission in original)). "To demonstrate good cause, the claimant must demonstrate that the new evidence was unavailable earlier." *Mayes v. Massanari*, 276 F.3d 453, 463 (9th Cir. 2001); *see also Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) ("If new information surfaces after the Secretary's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied"). However, a "claimant does not meet the good cause requirement by merely obtaining a more favorable report once his or her claim has been denied." *Mayes*, 276 F.3d at 463.

#### b. Rheumatoid Arthritis

The court finds that Plaintiff has failed to demonstrate that remand is appropriate to the ALJ for consideration of her rheumatoid arthritis under 42 U.S.C. § 405(g).

First, Plaintiff has failed to demonstrate that the new evidence of her rheumatoid arthritis is material. Specifically, Plaintiff does not explain how her rheumatoid arthritis bears "directly and substantially on the matter in dispute." Plaintiff presents no evidence of when she was diagnosed

with rheumatoid arthritis, let alone how it affects her ability to work. Additionally, Plaintiff does not show that there is a reasonable possibility that this new evidence would have changed the ALJ's non-disability determination. Dr. Bhandari's September 2015 letter, which states that Plaintiff is unable to work due to her rheumatoid arthritis, (A.R. 9), is entirely conclusory and appears to be unsupported by any other medical records. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) ("'[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings.'") (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004)) (emphasis in original omitted). Furthermore, the November 2016 lab result that Plaintiff submits with her motion contains little helpful information. *See* Pltf's MSJ at ECF-page 4. The document only shows Plaintiff's rheumatoid factor scores. It does not state that Plaintiff was diagnosed with rheumatoid arthritis nor does it contain any information about Plaintiff's functional limitations, which is necessary to determining Plaintiff's ability to perform work.

Second, Plaintiff fails to demonstrate good cause. Plaintiff does not explain why she could not have obtained evidence of her rheumatoid arthritis and its effect on her ability to work prior to the ALJ's January 2014 decision and the Appeal Council's June 2015 decision to deny her review of the ALJ's decision.

### c. Fibromyalgia

The court also finds that Plaintiff has failed to demonstrate that remand is appropriate to the ALJ for consideration of her fibromyalgia under 42 U.S.C. § 405(g).

First, Plaintiff has not explained how the new evidence of her fibromyalgia is material. Specifically, Plaintiff fails to explain how fibromyalgia bears "directly and substantially on the matter in dispute." As with her rheumatoid arthritis, Plaintiff provides no evidence regarding when she was diagnosed with fibromyalgia, let alone how this condition affects her ability to work. Additionally, Plaintiff fails to show that there is a "reasonable probability" that the new evidence would have changed the ALJ's non-disability determination. All Plaintiff does is disclose the allegedly new condition. Plaintiff's disclosures consist of her own statement in her motion and the May 2016 prescriptions for Cymbalta and Lyrica that she attached to her motion.

*See* Pltf's Mot. at ECF-pages 5-6. These disclosures are wholly insufficient because they provide no information about her functional limitations or pain.

Second, Plaintiff fails to demonstrate "good cause." Plaintiff does not explain why she could not have obtained evidence of her alleged fibromyalgia prior to the ALJ's January 2014 decision and the Appeal Council's June 2015 decision to deny her review of the ALJ's decision.

In sum, for the reasons stated herein, the court finds that Plaintiff has failed to demonstrate that remand is appropriate to the ALJ for consideration of her rheumatoid arthritis and fibromyalgia under 42 U.S.C. § 405(g). However, the court's finding does not preclude Plaintiff from filing a new application for benefits on the basis of these new conditions. *See Sanchez v. Sec'y of Health & Human Servs.*, 812 F.2d 509, 512 (9th Cir. 1987) (when a claimant has new evidence of a disability, the correct procedure is to reapply for benefits; "[i]f he can now prove a disabling physical or mental impairment, he will be entitled to benefits as of the date of the new application"); *Lundell v. Astrue*, No. 1:09-CV-01673 JLT, 2011 WL 3847129, at *20 (E.D. Cal. Aug. 30, 2011), aff'd sub nom. *Lundell v. Colvin*, 553 F. App'x 681 (9th Cir. 2014) ("To the extent that Plaintiff's health condition changed or worsened in the period after the ALJ's decision, nothing prevents her from filing a new application based upon the new evidence.") (citing *Sanchez*, 812 F.2d at 512); *see also Pyne v. Astrue*, No. 05-CV-01520 FVS TAG, 2008 WL 298828, at *7 (E.D. Cal. Feb. 1, 2008) ("To the extent that the Dr. Shakir's diagnosis of fibromyalgia indicates a new condition and the MRI demonstrates a deterioration of Claimant's arthritis, the evidence may support a new application for benefits, but it does not meet the standard for a new evidence remand.").

### B. The ALJ Properly Discounted Plaintiff's Subjective Complaints of Pain

Plaintiff states that she "knows the pain" that she is in. Mot. at 2. Liberally construing her argument, Plaintiff appears to contend that the ALJ did not properly credit her subjective complaints of pain.

#### 1. Legal Standard

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the

ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984). An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citing 42 U.S.C. § 423(d)(5)(A)). Nevertheless, the ALJ's credibility determinations "must be supported by specific, cogent reasons." *Reddick*, 157 F.3d at 722 (citation omitted). If an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id.* at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281–82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 343, 346–47 (9th Cir. 1991) (en banc) (citations omitted). Absent affirmative evidence that the claimant is malingering,[18] the ALJ must provide specific "clear and convincing" reasons for rejecting the claimant's testimony. *Smolen*, 80 F.3d at 1283–84.

---

[18] The ALJ did not conclude that Plaintiff was a malinger.

## 2. Analysis

The ALJ found that Plaintiff's "medically determinable impairments reasonably could be expected to cause the alleged symptoms;" however, the ALJ further found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible" in light of the medical evidence and other factors. A.R. 25-28. The ALJ carefully considered all the evidence in making this determination and gave several reasons for failing to fully credit Plaintiff's subjective complaints of pain.

First, the ALJ conducted a detailed review of the medical evidence and generally found that it did not support Plaintiff's complaints of debilitating pain. A.R. 25-27. For example, while the medical records showed that Plaintiff was diagnosed with bilateral carpal tunnel syndrome, L5-S1 grade 1 spondylolisthesis and bilateral spondylosis, and a thyroid nodule, Plaintiff's treatment was conservative, i.e., pain medications. *See, e.g.*, A.R. 313-16, 334-34, 364-65, 375-78, 344-50, 399. Additionally, the ALJ properly rejected Dr. Bhandari's March 12, 2013 opinion that Plaintiff was "unable to work due to her medical condition" because it was conclusory, and failed to provide the bases for his conclusion or any information on Plaintiff's functional limitations. A.R. 423. *See Burrell*, 775 F.3d at 1140. Specifically, there was no evidence that Dr. Bhandari saw Plaintiff after July 2012, so his opinion lacked "current medical support." A.R. 26. Additionally, Dr. Bhandari did not relate Plaintiff's alleged inability to work to any "specific condition" or provide a "time limit" on her inability to work. A.R. 26. Furthermore, Dr. Bhandari did not describe any functional limitations or any evidence that would support his conclusion. A.R. 26. Accordingly, the ALJ properly assigned greater weight to the opinion of consulting orthopedist, Dr. Bayne, who physically examined Plaintiff and considered all the medical evidence including Plaintiff's subjective complaints of pain in determining her residual functional capacity. A.R. 27.

Second, the ALJ observed that Plaintiff's "daily activities [were] somewhat more extensive than might be expected for a disabled individual, including taking care of four small children." A.R. 27. *See Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012) ("While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's

testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.]") (internal citations and internal quotation marks omitted). The record shows that Plaintiff performed daily activities as going out alone, shopping, and attending to her own personal care. A.R. 408-09.

Third, the ALJ considered that Plaintiff's work history aside from 2008 was minimal and that her inability to obtain work now "may not be attributable to her impairments, but to other factors such as having to care for three children born since 2008." A.R. 27; 20 C.F.R. § 416.929(c)(3) (in assessing credibility, the ALJ considers a claimant's "prior work record"); *see also Lester-Mahaffey v. Comm'r of Soc. Sec. Admin.*, 640 F. App'x 627, 629 (9th Cir. 2016) (finding that the "ALJ properly considered [the plaintiff's] limited work history before the onset of her alleged disability in concluding that she appeared to lack the motivation to work consistently"); *Sample*, 694 F.2d at 642 (in reaching its findings, the ALJ "is entitled to draw inferences logically flowing from the evidence").

Fourth, the ALJ noted that Plaintiff's treatment was "essentially routine and/or conservative in nature, consisting of pain medications" and there was "no indication of physical therapy or more invasive treatment such as steroid injections or recommendations for surgery that might indicate greater severity." A.R. 28, 313-15, 364-68, 375-78. This suggests that Plaintiff's pain might not have been as severe or serious as she alleged. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (holding that an ALJ may consider lack of treatment in making credibility determination); *see also Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (observing that claimant's physical ailments were treated with over-the-counter pain medication, noting that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of impairment"); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (holding that ALJ may properly rely on the fact that only conservative treatment had been prescribed).

Lastly, the ALJ noted that Plaintiff provided conflicting information about her past work. A.R. 28. For example, Plaintiff told Dr. Bayne that she left her job at Oakland International Airport due to the wrist and back pain. A.R. 437. However, Plaintiff told Dr. Elizabeth Whelchel, a consulting psychiatrist, that she "was fired from her last job in 2008." A.R. 407. The ALJ

properly concluded that these inconsistencies "suggest that the information provided by" Plaintiff "generally may not be entirely reliable." A.R. 28; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (explaining that "the ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid") (citation and internal quotation marks omitted); *Molina*, 674 F.3d at 1112 ("[T]he ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct[.]").

Therefore, given that the ALJ considered all of the above factors in concluding that Plaintiff's testimony was not credible, the court finds that the ALJ provided clear and convincing reasons for her decision, which were supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the court finds that the ALJ did not err in evaluating Plaintiff's back pain and carpal tunnel syndrome and finding that these impairments were not disabling. The ALJ did not err in accounting for these impairments in Plaintiff's residual functional capacity. The court also finds that remand is not appropriate for the ALJ to consider Plaintiff's new conditions of rheumatoid arthritis and fibromyalgia. Finally, the court finds that the ALJ did not err in finding that Plaintiff's subjective complaints of pain were not fully credible.

Therefore, the court denies Plaintiff's Motion for Summary Judgment, and grants Defendant's Cross-Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: August 25, 2017



_____
Donna M. Ryu
United States Magistrate Judge
Judge Donna M. Ryu